**Melinda PETTA, as Next Friend of Nikki Petta and Cavin Petta, Minors; Nikki Petta, a Minor; Cavin Petta, a Minor, Plaintiffs–Appellees,**

v.

**Adrian RIVERA, Individually and in his official capacity as Texas Department of Public Safety Highway Patrolman, Defendant–Appellant,**

and

**Texas Department of Public Safety, Defendant.**

No. 95–40157.

United States Court of Appeals, Fifth Circuit.

Jan. 16, 1998.

Roy Stewart Dale, William Daniel Mount, Jr., Dale & Klein, McAllen, TX, Paul G. Kratzig, Corpus Christi, TX, for the Pettas.

Demetri Anastasiadis, Austin, TX, for Defendant–Appellant and Defendant.

Before DUHÉ and DENNIS, Circuit Judges, and DUVAL, District Judge[1].

DUHÉ, Circuit Judge:

Officer Adrian Rivera ("Rivera") appeals the district court's denial of his motion for summary judgment based on the defense of qualified immunity. For the reasons that follow, we reverse and render.

## FACTUAL BACKGROUND

Because the parties dispute certain facts, we summarize the relevant incidents drawing inferences in the light most favorable to the nonmovants. *See Pfannstiel v. City of Marion,* 918 F.2d 1178, 1183 (5th Cir.1990).

On January 15, 1990, Rivera, a Texas Department of Public Safety ("TDPS") Patrol Officer, stopped Melinda Petta ("Petta") for speeding on Farm Road 70, southwest of Corpus Christi. Inside the car were Petta's two children ("the Petta children"): a son, Cavin, age 3, and a daughter, Nikki, age 7. Following a brief argument over the speed Petta had been driving, Petta alleges Rivera ordered her out of the vehicle. When Petta refused to exit and rolled up her window, Petta alleges Rivera "lost his temper, becoming agitated, irrational, threatening and verbally and physically abusive." Rivera then threatened to have her car towed. When Petta still refused to exit her vehicle, she claims Rivera began screaming and cursing

her, tried to jerk her door open, and attempted to smash her driver's side window with his nightstick. The alleged tirade culminated when Rivera menaced her with his .357 Magnum handgun. Petta panicked and fled the scene. She claims that Rivera fired a shot at her car as she drove away.

What followed was a high-speed pursuit, involving other TDPS officers as well as Rivera, that covered some 19 miles through the crowded city streets of Corpus Christi. Petta claims that during the chase Rivera again shot at her vehicle, attempting to blow out her tires. The record shows that Rivera's superiors ordered him not to fire at the fleeing car and that Rivera disregarded those orders. The pursuit ended with Petta's arrest by several officers at her apartment. Petta's children were never taken into custody nor were they touched by any officers.

## PROCEDURAL HISTORY

Petta, on behalf of her two minor children, sued the TDPS and Rivera, in both his official and individual capacities, asserting various state law claims and § 1983 claims for use of excessive force in violation of the Fourth and Fourteenth Amendments. The court dismissed all state and federal claims against the TDPS and Rivera, in his official capacity, as barred by the Eleventh Amendment. As to Rivera in his individual capacity, the court granted his motion for summary judgment on plaintiffs' § 1983 claim based on the Fourth Amendment. The court, citing *Brower v. Inyo County,* 489 U.S. 593, 596–97, 109 S.Ct. 1378, 1381–82, 103 L.Ed.2d 628 (1989), and *California v. Hodari D.,* 499 U.S. 621, 624–26, 111 S.Ct. 1547, 1548–50, 113 L.Ed.2d 690 (1991), found that no "seizure" of the children had occurred[2] that would trigger Fourth Amendment protections.

Finding that Rivera had not moved for dismissal or summary judgment with regard to the Fourteenth Amendment claims, the court allowed Rivera an additional ten days to file an appropriate motion. Rivera accord-

---

1. District Judge of the Eastern District of Louisiana, sitting by designation.

2. Plaintiffs did not appeal the district court's dismissal of their Fourth Amendment claims.

Whether the district court correctly found no "seizure" of the children under these facts is therefore not before us.

ingly filed a supplemental motion for summary judgment based on qualified immunity as to the Fourteenth Amendment claims. The court, however, denied Rivera's motion without explanation and set for jury trial plaintiffs' Fourteenth Amendment claims and supplemental state law claims of assault and battery and negligence against Rivera, in his individual capacity. The court later granted Rivera's motion to stay trial pending his interlocutory appeal.

## DISCUSSION

### I.

■ Generally, appellate courts have jurisdiction to hear appeals only from "final decisions" of district courts. *See* 28 U.S.C. § 1291 (West 1993). Certain collateral orders have been recognized as "final decisions" within the meaning of § 1291, i.e., those which "[1] conclusively determine the disputed question, [2] resolve an important issue completely separate from the merits of the action, and [3] [are] effectively unreviewable on appeal from a final judgment." *Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 142–43, 113 S.Ct. 684, 686–87, 121 L.Ed.2d 605 (1993); *see Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 546, 69 S.Ct. 1221, 1225–26, 93 L.Ed. 1528 (1949). A district court's order denying a defendant's motion for summary judgment based on the defense of qualified immunity is an immediately appealable "final decision" under the collateral order doctrine where the order denies qualified immunity purely as a matter of law. *Johnson v. Jones,* 515 U.S. 304, 310–11, 115 S.Ct. 2151, 2155, 132 L.Ed.2d 238 (1995); *Mitchell v. Forsyth,* 472 U.S. 511, 528, 105 S.Ct. 2806, 2816–17, 86 L.Ed.2d 411 (1985); *Boulos v. Wilson,* 834 F.2d 504, 509 (5th Cir.1987). By contrast, when a district court denies a qualified immunity defense based on its determination that the summary judgment record raises a genuine issue of fact concerning the applicability of the defense, such order is not immediately appealable under the collateral order doctrine. *Johnson,* 515 U.S. at 312–13, 115 S.Ct. at 2156; *Boulos,* 834 F.2d at 509.

■ Here, the district court denied Rivera's motion for summary judgment based on the defense of qualified immunity without supporting explanation. We are not precluded, however, from reviewing the order. In such a case, the movant can claim on appeal "that all of the conduct which the District Court deemed sufficiently supported for purposes of summary judgment met the *Harlow* standard of 'objective legal reasonableness.'" *Behrens v. Pelletier,* 516 U.S. 299, 313, 116 S.Ct. 834, 842, 133 L.Ed.2d 773 (1996); *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). We must therefore review the record to determine what conduct the district court attributed to Rivera in finding that he had violated clearly established law and was not, therefore, entitled to the defense of qualified immunity. *Behrens,* 516 U.S. at 312–14, 116 S.Ct. at 842; *Johnson,* 515 U.S. at 318–20, 115 S.Ct. at 2159; *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738.

As our discussion, *infra,* demonstrates, our review of the record shows that Rivera is entitled to the defense of qualified immunity based on the undisputed fact that the Petta children alleged purely psychological harm as a result of Rivera's actions. At the time of these events, it was not "clearly established" in our law that such non-physical harm gave rise to a constitutional tort.

### II.

■ A police officer who, acting under color of state law, subjects a United States citizen to a deprivation of his constitutional rights is liable for damages to the injured party. *See* 42 U.S.C. § 1983 (West 1997); *Scheuer v. Rhodes,* 416 U.S. 232, 237, 94 S.Ct. 1683, 1687, 40 L.Ed.2d 90 (1974). The Supreme Court has read § 1983 "in harmony with general principles of tort immunities and defenses rather than in derogation of them." *Imbler v. Pachtman,* 424 U.S. 409, 418, 96 S.Ct. 984, 989, 47 L.Ed.2d 128 (1976); *see Tenney v. Brandhove,* 341 U.S. 367, 376, 71 S.Ct. 783, 788, 95 L.Ed. 1019 (1951). Thus, a police officer may interpose a defense of qualified immunity when faced with a § 1983 action. *Imbler,* 424 U.S. at 418, 96 S.Ct. at 989; *Pierson v. Ray,* 386 U.S. 547,

555–557, 87 S.Ct. 1213, 1218–19, 18 L.Ed.2d 288 (1967); *Rankin v. Klevenhagen,* 5 F.3d 103, 108 (5th Cir.1993).

The doctrine of qualified immunity shields a government official performing discretionary functions from civil damages liability, provided his complained of actions meet the test of "objective legal reasonableness." *Harlow v. Fitzgerald,* 457 U.S. 800, 819, 102 S.Ct. 2727, 2739, 73 L.Ed.2d 396 (1982). We assess the "objective reasonableness" of an officer's actions in light of legal rules that were "clearly established" at the time those actions were taken. *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

We must take care to identify the relevant "clearly established law" at the proper level of generality so that the defense of qualified immunity will serve its intended purpose, i.e., to allow officers "reasonably [to] anticipate when their conduct may give rise to liability for damages." *Anderson,* 483 U.S. at 639–40, 107 S.Ct. at 3039, *quoting Davis v. Scherer,* 468 U.S. 183, 195, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984). To that end, for a right to be "clearly established" we require that its "contours . . . must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039. It is not necessary, however, that prior cases have held the particular action in question unlawful; "but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id., citing Mitchell,* 472 U.S. at 535 n. 12, 105 S.Ct. at 2820 n. 12 *and Malley v. Briggs,* 475 U.S. 335, 344–45, 106 S.Ct. 1092, 1097–98, 89 L.Ed.2d 271 (1986).

In *Siegert v. Gilley,* the Supreme Court clarified the "analytical structure" for addressing a claim of qualified immunity. 500 U.S. 226, 231–32, 111 S.Ct. 1789, 1793,

114 L.Ed.2d 277 (1991). Once a defendant pleads a defense of qualified immunity, the trial judge must first determine "whether the plaintiff has alleged a constitutional violation at all" under current law. *Siegert,* 500 U.S. at 232, 111 S.Ct. at 1793; *see Rankin,* 5 F.3d at 108 ("When evaluating whether a plaintiff stated a constitutional violation, we looked to currently applicable constitutional standards."). If the plaintiff has done so, the judge then determines whether the defendant's actions were "objectively reasonable" with reference to "clearly established law" at the time of the conduct in question. *Siegert,* 500 U.S. at 231, 111 S.Ct. at 1793; *Rankin,* 5 F.3d at 108. We have observed that this analysis will at times lead to a "somewhat schizophrenic approach," as, for example, when a court must apply conflicting legal standards to the two prongs of the test. *See, e.g., Rankin,* 5 F.3d at 109 & n. 7.[3]

With those principles in mind, we now turn to the merits of Rivera's qualified immunity defense. We review *de novo* the denial of Rivera's motion for summary judgment on the basis of qualified immunity. *Hale v. Townley,* 45 F.3d 914, 917 (5th Cir. 1995); *Salas v. Carpenter,* 980 F.2d 299, 304 (5th Cir.1992).

### III.

#### A.

The Petta children claim that Rivera's abusive behavior and use of excessive force during the initial stop and ensuing chase caused them severe emotional harm and thus deprived them of liberty without due process, in violation of the Fourteenth Amendment. *See, e.g., Landol–Rivera v. Cruz Cosme,* 906 F.2d 791, 796 (1st Cir.1990); *Pleasant v. Zamieski,* 895 F.2d 272, 276 n. 2 (6th Cir.1990); *Sinaloa Lake Owners Ass'n v. City of Simi Valley,* 882 F.2d 1398, 1408 n.

---

**3.** In *Rankin,* we applied *Hudson v. McMillian,* 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992), to the initial "constitutional violation" question, while applying *Shillingford v. Holmes,* 634 F.2d 263 (5th Cir.1981), to the "clearly established law" question, even though *Hudson* had altered the *Shillingford* test for Eighth Amendment violations. *See Hudson,* 503 U.S. at

9–10, 112 S.Ct. at 1000–1001; *Shillingford,* 634 F.2d at 265. This apparent conundrum was inevitable, however, because the qualified immunity analysis requires us to evaluate the state of a "constitutional violation" at two different times, i.e., when the plaintiff files his lawsuit and when the allegedly violative conduct occurred. *See Siegert,* 500 U.S. at 231–32, 111 S.Ct. at 1792–93.

10 (9th Cir.1989).[4] We assume without deciding that the Petta children have alleged a constitutional violation under current law [5] because we find that, at the time of the incident in question, the law was not "clearly established" that a police officer's use of excessive force resulting in purely emotional harm rose to the level of a constitutional due process violation.

### B.

In order to assess what "clearly established" legal standards governed Rivera's actions on January 15, 1990, we must trace the origins in this Circuit of a Fourteenth Amendment claim based on a police officer's use of excessive force.

### · 1.

In *Shillingford v. Holmes*, 634 F.2d 263, 265 (5th Cir.1981), we first sketched the parameters of such a claim, relying in part on *Hall v. Tawney*, 621 F.2d 607, 613 (4th Cir. 1980), and *Johnson v. Glick*, 481 F.2d 1028, 1033 (2nd Cir.1973). We defined the "constitutional tort" thus:

> If the state officer's action caused severe injuries, was grossly disproportionate to the need for action under the circum-

stances and was inspired by malice rather than merely careless or unwise excess of zeal so that it amounted to an abuse of official power that shocks the conscience, it should be redressed under Section 1983. *Shillingford*, 634 F.2d at 265. Regarding the "severe injury" requirement, we specifically noted that "[t]he degree of force exerted and the extent of physical injury inflicted that together amount to a constitutional deprivation must, of course, be determined by the facts of a given case." *Id.* We thus avoided drawing any "bright lines" based on the severity of a particular injury that would separate constitutional from non-constitutional violations. *Id., citing Baker v. McCollan*, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). Furthermore, in addressing the factual situation presented in *Shillingford*,[6] we focused as much on the *potential* for severe injury created by the policeman's conduct as on the actual injury itself. *Shillingford*, 634 F.2d at 266 ("That the results of the attack on Shillingford's person were not crippling was merely fortuitous. That same blow might have caused blindness or other permanent injury.").

*Shillingford* provided the standard for excessive force claims in this Circuit for the next eight years.[7] We note, however, a

---

**4.** We cite cases from other Circuits because, as our discussion, *infra* Part III.B.4 demonstrates, we have not found cases in our Circuit, post-*Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), analyzing excessive force claims under the Fourteenth Amendment where, although in the context of an arrest or investigatory stop, no technical "seizure" had occurred for Fourth Amendment purposes. *Cf. Ikerd v. Blair*, 101 F.3d 430, 433 n. 6 (5th Cir. 1996); *Mouille v. City of Live Oak*, 918 F.2d 548, 550–51 (5th Cir.1990).

**5.** *But see Ikerd*, 101 F.3d at 434 n. 10 (declining to address issue, in Fourth Amendment context, whether some *physical* injury is required to state excessive force claim), *and Hinojosa v. City of Terrell, Texas*, 834 F.2d 1223, 1230 (5th Cir.1988) (declining to reach issue, outside Fourth Amendment context, "whether or not some type of physical injury will in *every* instance be necessary for [§] 1983 liability in a use of excessive force claim."). *See* discussion *infra* Part III.B.3.

**6.** *Shillingford* involved a policeman's unprovoked attack of a bystander who was attempting to photograph an arrest. The policeman smashed Shillingford's camera into his face with a nightstick, destroying the camera and lacerat-

ing Shillingford's forehead. *Shillingford*, 634 F.2d at 264.

**7.** *See, e.g., Raley v. Fraser*, 747 F.2d 287, 289 (5th Cir.1984); *Lynch v. Cannatella*, 810 F.2d 1363, 1375 (5th Cir.1987); *Stevens v. Corbell*, 832 F.2d 884, 889 (5th Cir.1987); *Hinojosa v. City of Terrell, Texas*, 834 F.2d 1223, 1229 (5th Cir.1988); *Brumfield v. Jones*, 849 F.2d 152, 156 (5th Cir.1988). In 1986, however, the Supreme Court decided *Whitley v. Albers*, 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986), which may have imposed a slightly different standard on excessive force claims based on the Eighth Amendment's prohibition of cruel and unusual punishments. In *Whitley*, the Court stated that "whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously or sadistically for the very purposes of causing harm.'" *Whitley*, 475 U.S. at 320–21, 106 S.Ct. at 1084–85 *quoting Johnson v. Glick*, 481 F.2d 1028, 1033 (2nd Cir.1973). We observe, however, that in formulating its standard for Eighth Amendment excessive force violations in 1986, the Supreme Court relied on *Johnson v. Glick, supra*, the same case the *Shillingford* court

handful of decisions applying *Shillingford* that shed light on the question before us.

In *McFadden v. Lucas*, 713 F.2d 143 (5th Cir.1983), we considered a prisoner's § 1983 claim, alleging, *inter alia*, that twenty-two correction officers forced him, through an "intimidating show of force," to shave his beard, which he wore for religious reasons, in violation of the First and Eighth Amendments. In determining whether the plaintiff had stated a claim that his right to be free from cruel and unusual punishment had been violated, we relied on *Shillingford* and *Johnson v. Glick*, *supra*. *Id*. at 146. We found that plaintiff's complaint

> [fell] so short of stating a section 1983 cause of action as to warrant *sua sponte* dismissal by the court below. The plaintiff has nowhere alleged that he was physically assaulted. In fact, the plaintiff nowhere alleges that, except for the commonplace event of being shaved, any touching of his person occurred at all.

*Id*. at 146–47. We went on to state that, even if the officers' show of force could be considered excessive, "we must, *in the absence of physical abuse*, concur with the lower court's dismissal." *Id*. at 147 (emphasis added). The absence of physical abuse seemed to us, under those circumstances, to prevent the alleged misconduct from "shock[ing] the conscience." *Id*., *quoting Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952).

In *Coon v. Ledbetter*, 780 F.2d 1158 (5th Cir.1986), we allowed a § 1983 claim for excessive force on behalf of a young child under circumstances somewhat similar to ours. In *Coon*, the police allegedly fired into a trailer attempting to apprehend the trailer's owner, Billy Dan Coon. Coon's four-year-old daughter, Racheal, was inside the trailer when the shot was fired. Although the facts do not indicate that Racheal suffered anything but "sleeplessness and nightmares" after the incident, we nonetheless found that she had sufficiently alleged a violation of her constitutional rights. *Id*. at 1160–1161.[8]

In *Coon*, we addressed the contours of the excessive force claim in the context of whether the plaintiffs had adequately alleged a constitutional violation. *Id*. at 1160–61. We discussed the officers' defense of qualified immunity only insofar as it could arise on retrial. *Id*. at 1164. We did not, in any case, squarely address the question whether non-physical injury alone could satisfy the *Shillingford* test (although we certainly implied that it would). Regarding the applicability of qualified immunity, we merely observed that "[u]se of excessive force in making an arrest violates clearly established rights, and the doctrine of qualified immunity therefore does not shield an officer who uses excessive force." *Id*.

We do not call *Coon* into question, however. In 1986, *Shillingford* was "clearly established law" in this area and we had not yet drawn any "bright lines" between constitutional and non-constitutional violations on the basis of physical or non-physical injuries (*see* discussion *infra* at III.B.3). Thus, the *Coon* court's implicit finding that the officers' con-

---

had relied on. *See Shillingford*, 634 F.2d at 265. Also, we have before held that the *Whitley* test did not govern a *Fourteenth* Amendment excessive force claim in 1987, *see Stevens*, 832 F.2d at 889, while at the same time noting the Supreme Court's statement in *Whitley* that "at least in the prison security guard context, the 'Due Process clause affords no greater protection than does the Cruel and Unusual Punishment Clause.'" *Id*., *quoting Whitley*, 475 U.S. at 327, 106 S.Ct. at 1087. Thus, it seems unclear whether there was a different standard for Eighth Amendment, as opposed to Fourth and Fourteenth Amendment, excessive force claims in 1986; as our discussion, *infra*, demonstrates, however, the need to distinguish became clearer with the Supreme Court's decisions in *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989),

and *Hudson v. McMillian*, 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992).

**8.** Addressing why Racheal had alleged sufficient "personal loss required for a constitutional claim," and why her mother, Dana, had not, we stated:

> There was no evidence that any act of the deputies was directed toward Dana; she was not directly involved in the shooting and was with the deputies when it occurred. Racheal, however, was in the trailer. There was evidence that Coon staggered into the trailer and while he was there attempted to protect Racheal from the gunfire, and there was evidence that Deputy Gussberry fired a round of heavy buckshot into the trailer at that time.

*Id*. at 1161.

duct there satisfied the *Shillingford* test (and in particular that Racheal Coon's injuries were "severe," *see Shillingford*, 634 F.2d at 265) appears justified in light of "clearly established" legal rules at that time.

Shortly after *Coon*, we decided *Checki v. Webb*, 785 F.2d 534 (5th Cir.1986), in which police officers allegedly chased the plaintiffs at high speeds without probable cause and then physically abused them at a police roadblock. *Id.* at 535–36. In finding that the plaintiffs had filed suit in a proper venue under 28 U.S.C. § 1391 and had thus interrupted prescription under Louisiana law, we considered where the plaintiffs' constitutional claim "arose" for purposes of the federal venue statute. *Id.* at 537–38. We held that, although the plaintiffs sustained all *physical* injuries in the Middle District of Louisiana, they could have properly alleged a constitutional violation arising out of the officers' conduct (the high-speed chase) in the Eastern District:

> It cannot be reasonably argued that no serious physical danger confronts civilians who are forced to travel at speeds over 100 mph in their attempt to flee a terrorizing police officer. Furthermore, there is no valid reason for insisting on physical injury before a section 1983 claim can be stated in this context. A police officer who terrorizes a civilian by brandishing a cocked gun in front of that civilian's face may not cause *physical* injury, but he has certainly laid the building blocks for a section 1983 claim against him.

*Id.* at 538. Thus, we found venue proper in the Eastern District of Louisiana. *Id.*

Over a year later we decided *Jefferson v. Ysleta Independent School District*, 817 F.2d 303 (5th Cir.1987). In *Jefferson*, the parents of an eight-year-old girl sued school officials under § 1983 for allegedly tying her to a chair with a jump rope for the greater part of two days, denying her access to the bath-

room and thereby causing her "humiliation and mental anguish ... and [impairment] in her ability to study productively." *Id.* at 304. We affirmed the district court's rejection, on summary judgment, of the defendants' claim of qualified immunity:

> We are persuaded that in January 1985, a competent teacher knew or should have known that to tie a second-grade student to a chair for an entire school day and for a substantial portion of a second day, as an educational exercise, with no suggested justification, such as punishment or discipline, was constitutionally impermissible.

*Id.* at 305. We found, citing *Shillingford*, that plaintiffs' allegations, if proven, "would implicate, *inter alia*, Jardine's fifth and fourteenth amendment rights to substantive due process, specifically her right to be free from bodily restraint." *Id.*[9] Again, we did not squarely address whether non-physical injuries (which are all that were *alleged* in *Jefferson*, although the claimed constitutional wrongs clearly involved prolonged physical distress) would satisfy the *Shillingford* "severe injury" requirement. Instead, we focused on the outrageous conduct of the defendants. *See id.*

Less than a year later, we addressed in *Hinojosa v. City of Terrell, Texas*, 834 F.2d 1223 (5th Cir.1988), the hypothetical situation posited in *Checki* (*supra*, 785 F.2d at 538), but perhaps reached a different result than the *Checki* panel had predicted. There, the plaintiff sued several officers under § 1983 for allegedly using excessive force against him where, in the course of an altercation and subsequent arrest, an officer waved a gun in the plaintiff's face. We treated the plaintiff's claims as arising under the Fourteenth Amendment, however, because we found that the alleged excessive force (waving a gun in the plaintiff's face) occurred before, and was not involved in, the plaintiff's subsequent arrest. *See id.* at 1229 n. 7. We

---

**9.** As our discussion of legal developments subsequent to *Jefferson* demonstrates (*see* discussion *infra* III.B.3), we need not distinguish *Jefferson*. We do point out, however, that the constitutional right relied upon in *Jefferson*, while deriving from the due process clause, was slightly distinct from that relied on by the Petta children. Arguably, a due process right "to be free from bodily

restraint," *see Jefferson*, 817 F.2d at 305, is conceptually different from a due process right "to be free from excessive force," where the claimed excessive force does not involve any bodily restraint or "damage to a person's bodily integrity," *see Shillingford*, 634 F.2d at 265, whatsoever.

found that the plaintiff had not produced sufficient evidence under *Shillingford* to support the jury's finding in his favor on the excessive force claim. We therefore reversed the district court's denial of the defendant's motions for judgment notwithstanding the verdict and for new trial. *Id.* at 1229–31.

We found in *Hinojosa* that the plaintiff's injury "which [could] only be characterized as temporary emotional distress, simply [did] not rise to a level that can be redressed for such a claim under section 1983." *Id.* at 1229. We then stated that

> [t]here is absolutely no evidence ... that Hinojosa was struck, *or even touched,* during the incident. Hinojosa did not claim to have suffered *even minor physical injuries* or intrusion.

*Id.* (emphasis added). While those statements strongly suggest that the *Hinojosa* panel would have required some *physical* injury to meet the *Shillingford* "severe injury" requirement, the panel went on to state that "[t]his Court does not here determine whether or not some type of physical injury will in *every* instance be necessary for section 1983 liability in a use of excessive force claim." *Id.*[10]

### 2.

In sum, *Shillingford* was the "clearly established law" governing most, if not all, excessive force claims from January 15, 1981 until July 5, 1989, when we decided *Johnson v. Morel,* 876 F.2d 477 (5th Cir.1989) (*see infra* Part III.B.3). We pause here, however, to assess the state of the law just prior to *Johnson* to demonstrate that Officer Rivera might *not* be entitled to qualified immunity if *Shillingford* and its progeny had continued to be "clearly established law" for the Petta children's claims.

As the law stood under *Shillingford, McFadden, Coon, Checki, Jefferson* and *Hi-*

*nojosa* (*see supra*), our Circuit seemed to make an analytical distinction between (1) cases deciding whether a defendant was entitled to qualified immunity on a claim of excessive force (*see, e.g., Jefferson,* 817 F.2d at 305; *Lynch v. Cannatella,* 810 F.2d 1363, 1374 (5th Cir.1987)) and (2) cases determining whether a plaintiff had sufficiently alleged a cause of action for excessive force under § 1983 (*see, e.g., Shillingford,* 634 F.2d at 265; *Hinojosa,* 834 F.2d at 1229–30).[11] Such a distinction is justified in the following sense: in the former cases, we focused on the "objective reasonableness" of the defendant's actions in order to further one purpose of the qualified immunity defense, i.e., "to insure that [public officials] do not hesitate to take actions reasonably calculated to advance the public good," *Lynch,* 810 F.2d at 1374; in the latter cases, we focused, *inter alia,* on the severity of the alleged injury, because the purpose of such threshold requirements in a § 1983 excessive force claim is "to distinguish potential constitutional violations from mere breaches of state tort law." *Hinojosa,* 834 F.2d at 1229; *Shillingford,* 634 F.2d at 264. It would then follow that the "severity" of a particular injury would be determinative only in the second group of cases: i.e., where we are assessing whether a plaintiff has adequately pled a constitutional violation. *See, e.g., Hinojosa,* 834 F.2d at 1230; *Gumz,* 772 F.2d at 1401.

If such were the analysis in the Fifth Circuit today, the Petta children could plausibly argue that Rivera is *not* entitled to assert the defense of qualified immunity: Rivera's conduct violated "clearly established law" (i.e., *Shillingford*) because it would have been apparent to a reasonable officer that such conduct (a high-speed chase, shooting at the fleeing car's tires) in response to a speeding violation (1) was grossly disproportionate to the need presented, (2) was motivated by

---

**10.** The *Hinojosa* panel seemed to cite with approval the Seventh Circuit's decision in *Gumz v. Morrissette,* 772 F.2d 1395 (7th Cir.1985), which stated that "the ultimate question here is, after all, whether the use of force was so egregious as to be constitutionally excessive, and the presence of some physical injury is certainly relevant to that determination." *Id.* at 1401.

**11.** *Coon,* we should note, is somewhat of an anomaly since it addressed both questions, *see Coon,* 780 F.2d at 1160–61, 1164, but considered the severity of the plaintiff's injury under neither.

malice,[12] and (3) *could have* caused severe injuries.[13] *See, e.g., Hinojosa,* 834 F.2d at 1229. That is the position of the dissent (*see infra* at 346–58), as we understand it. Our precedents intervening between 1988 and January 15, 1990 (the time of the conduct in question here), however, slightly alter the focus of our qualified immunity analysis (*see* discussion *infra* Part III.B.3) and constrain us to part company with the dissent.

### 3.

In *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the Supreme Court held that

> *all* claims that law enforcement officers have used excessive force—deadly or not— in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach.

*Graham,* 490 U.S. at 395, 109 S.Ct. at 1871. The Court thus rejected the *Johnson v. Glick* test (*see* discussion *supra* Part III.B.1) for those excessive force claims that implicate the Fourth Amendment's "explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct...." *Id.*[14] The Court endorsed the *Johnson v. Glick* test, however, in the context of an Eighth Amendment excessive force

claim. *Id.* at 398 n. 11, 109 S.Ct. at 1873 n. 11 (*Johnson v. Glick* test "might be useful in analyzing excessive force claims brought under the Eighth Amendment."). Finally, the Court recognized that the due process clause could have continuing viability in excessive force claims not implicating a specific Bill of Rights protection. *Graham,* 490 U.S. at 395 n. 10, 109 S.Ct. at 1871 n. 10 (because it is unclear whether the Fourth Amendment extends to pretrial detainees, "the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment.").

Expressly relying on *Graham,* our *en banc* Court addressed, in *Johnson v. Morel,* 876 F.2d 477 (5th Cir.1989), whether the plaintiff had stated a Fourth Amendment violation where an officer roughly handcuffed him during an investigatory stop, allegedly resulting in permanent scars on his wrists. *Johnson,* 876 F.2d at 478–79. We stated that "[t]here can be a constitutional violation only if significant injuries resulted from the officer's use of *excessive* force." *Id.* at 479–80.[15] Notably, we appended the following footnote to our "significant injury" holding:

> We think it unlikely that such a significant injury will be caused by unnecessary force without significant *physical* injury. However, on the facts before us here, we do not

---

**12.** In any event, plaintiffs could have argued that the summary judgment record presented genuine factual disputes as to the first two elements and that the district court's denial of Rivera's qualified immunity defense was therefore unreviewable on appeal under the collateral order doctrine. *See* discussion *supra* Part I; *see also Johnson v. Jones,* 515 U.S. at 312, 115 S.Ct. at 2156.

**13.** Under the *Shillingford* analysis, whether Rivera's conduct *in actual fact* caused "severe injuries" would only be an appropriate inquiry in addressing whether the Petta children adequately alleged a constitutional violation. *See Shillingford,* 634 F.2d at 266. We have already assumed for purposes of this appeal that the Petta children adequately pled an excessive force claim under current law. *See* discussion *supra* Part III.A.

**14.** The Fourth Amendment standard, as explicated by the Court, assesses the "objective reasonableness" of an officer's conduct by focusing on

the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

*Id.* at 396, 109 S.Ct. at 1871, *citing Tennessee v. Garner,* 471 U.S. 1, 8–9, 105 S.Ct. 1694, 1699–1700, 85 L.Ed.2d 1 (1985).

**15.** We set forth the required elements for an excessive force claim based on a violation of the Fourth Amendment as:

(1) a significant injury, which
(2) resulted directly and only from the use of force that was clearly excessive to the need; and the excessiveness of which was
(3) objectively unreasonable.

*Johnson,* 876 F.2d at 480. At the same time, we "overrule[d] all previous decisions of the circuit to the contrary." *Id.*

decide whether a significant but non-physical injury would be legally sufficient.

*Id.* at 480 n. 1. Finding that the plaintiff had created a fact issue as to whether his injuries were "significant," we allowed him to go forward with his excessive force claim. *Id.* at 480.

Judge Rubin, joined by six other Judges, concurred in the Court's judgment, but criticized the majority, *inter alia,* for adding a "significant injury" requirement to the Fourth Amendment claim. *Johnson,* 876 F.2d at 480–81 (Rubin, J., concurring).[16] Additionally, Judge Rubin dissented from the majority opinion insofar as it read *Graham* to bar the plaintiff's due process claims for abuse that occurred *before* and *after* the arrest. *Id.* at 482–84; *see Graham,* 490 U.S. at 394–95 & n. 10, 109 S.Ct. at 1871 & n. 10.

*Johnson v. Morel* remained the law in this Circuit until *Hudson v. McMillian,* 503 U.S. 1, 7–8, 112 S.Ct. 995, 999–1000, 117 L.Ed.2d 156 (1992), although itself in the Eighth Amendment context, overruled by implication *Johnson's* "significant injury" requirement.[17] *See, e.g., Harper v. Harris County, Texas,* 21 F.3d 597, 600 (5th Cir.1994) ("We now hold that the *Johnson* standard is no longer valid in the wake of *Hudson v. McMillian. . . .*"). Between July 5, 1989 and February 25, 1992, however, *Johnson v. Morel* was "clearly established law" regarding an excessive force claim brought under the Fourth Amendment. As we have noted above, this is the relevant "legal window" within which we must look to determine whether Officer Rivera's actions on January 15, 1990 were "objectively reasonable."

**16.** Significantly for our purposes, Judge Rubin remarked that "[e]ven under the stringent Fourteenth Amendment 'shock the conscience' test, a plaintiff could recover for a policeman's use of excessive force without demonstrating that he had suffered severe, permanent, or *physical* injuries." *Johnson,* 876 F.2d at 481 (Rubin, J., concurring) (emphasis added). Judge Rubin cited *Checki v. Webb* (*see supra* Part III.B.1) for the proposition that non-physical injuries were cognizable under the due process clause. *Id.* at 481 n. 9.

**17.** Reversing the Fifth Circuit, the Supreme Court in *Hudson* held that a prisoner was not required to prove "significant injury" as a pre-

The most significant development in our Circuit's law regarding excessive force claims and qualified immunity came, ironically,[18] almost three years after the *Johnson v. Morel* window closed, in *Dunn v. Denk,* 54 F.3d 248 (5th Cir.1995), *rev'd en banc,* 79 F.3d 401 (5th Cir.1996). In *Dunn,* a police officer arrested the plaintiff in January, 1990, and in doing so allegedly threw her facedown in a ditch, put his knee in the small of her back, handcuffed her, pulled her up by her arms and placed her in his squad car. *Dunn,* 54 F.3d at 249. The plaintiff, who was on a weekend pass from a mental institution and was being driven home by her friend when they were stopped, alleged she suffered only minor bruises but serious psychological injury. *Id.* She sued the officer under § 1983 for malicious prosecution and use of excessive force; the jury found for her on the latter claim. *Id.*

The *Dunn* panel found that the officer was not entitled to qualified immunity, because "[i]t was clearly established before January 1990, when Denk arrested Dunn, that both physical and psychological injuries were compensable in civil rights actions." *Id.* at 250, *citing Hinshaw v. Doffer,* 785 F.2d 1260 (5th Cir.1986) *and Keyes v. Lauga,* 635 F.2d 330 (5th Cir.1981). The *Dunn* majority thus included "significant injury" as a component of the retrospective, "clearly established law" prong of the qualified immunity analysis:

> Although no longer required, at *the time of this incident* significant injury was a necessary element of an excessive force claim. Accordingly, to defeat Denk's qualified immunity defense Dunn was obliged to prove a significant injury.

requisite to his Eighth Amendment excessive force claim; instead, the Court adopted the *Whitley v. Albers* (*see supra* note 7) "malicious and sadistic" standard for all Eighth Amendment excessive force claims. *Hudson,* 503 U.S. at 6–7, 112 S.Ct. at 998–999.

**18.** Ironic, because normally we would look only to case law in effect on January 15, 1990, to determine what law was "clearly established" at that time. The two decisions in *Dunn v. Denk* are relevant, however, because they provide a retrospective assessment of what "clearly established law" was regarding a Fourth Amendment excessive force claim in January, 1990. *See Dunn,* 79 F.3d at 402, 54 F.3d at 250.

*Dunn,* 54 F.3d at 249 (emphasis added); *see Siegert,* 500 U.S. at 231, 111 S.Ct. at 1793; *Rankin,* 5 F.3d at 108–09 & n. 7; *see also* discussion *supra* Part III.B.1. Although he dissented, Judge Barksdale, like the majority, viewed the "significant injury" requirement as an element of the "clearly established law" guiding the officer's conduct at the time of the incident.[19] He simply disagreed with the majority that, under *Johnson* in 1990, it was "clearly established" that the plaintiff had a constitutional right to be free from non-physical, psychological injury resulting from excessive force. *See Dunn,* 54 F.3d at 256 (Barksdale, J., dissenting).

A fragmented *en banc* Court vacated the *Dunn* panel opinion and found the officer entitled to qualified immunity. *See Dunn v. Denk,* 79 F.3d 401, 403 (5th Cir.) (en banc), *cert. denied* —— U.S. ——, 117 S.Ct. 61, —— L.Ed.2d —— (1996). Eleven judges joined Part I of Judge King's "majority" opinion, six of those judges by way of separate concurrence.[20] While conceding that under *Hudson v. McMillian, supra,* the plaintiff's injury may well have satisfied *present* constitutional standards, *see* 79 F.3d at 402–03, Judge King continued her analysis by "look[ing] to the state of the law when the arrest at issue occurred." *Id.* at 403, *citing Harper,* 21 F.3d at 601.[21] Judge King went on to state:

Given the explicit language of *Johnson,* and its footnote 1 in particular, we conclude that the law at the time of this arrest was uncertain regarding whether "a significant injury will be caused by unnecessary force without significant physical injury." On the present facts, Denk was entitled to qualified immunity from the claims asserted in this case.

*Dunn,* 79 F.3d at 403, *quoting Johnson,* 876 F.2d at 480 n. 1.[22]

This holding demonstrates the same qualified immunity analysis as that employed by the *Dunn* panel majority and dissent, *supra.* Judge King relied on the significance of the injury as, using the defendant's phrase, an "objective, validating event of the reasonableness of force used in making an arrest." *Dunn,* 79 F.3d at 403. The dissent to the *en banc* decision confirms this view. In arguing that the majority "distort[ed] the law of qualified immunity," the dissent advocated a focus, not on the *results* of the officer's actions (i.e., whether they caused "significant injury") but rather on the reasonableness of the *actions* themselves:

Qualified immunity is concerned only with the reasonableness of an officer's actions. Once an officer uses objectively unreasonable force to effect an arrest, he loses his

**19.** Judge Barksdale initially observed: "It goes without saying that, to avoid a qualified immunity defense, a plaintiff must claim a constitutional violation that was clearly established at the time of the alleged wrongful conduct." *Dunn,* 54 F.3d at 253 (Barksdale, J., dissenting). He later stated that "even assuming *arguendo* that non-physical injury can be 'significant' under *Johnson,* the question remains whether this rule was 'clearly established' at the time of the incident in issue, so as to place Officer Denk outside the protection of qualified immunity." *Id.* at 255.

**20.** Judge King's opinion was joined by Judges Garwood, Higginbotham, Davis and Duhé. Judge Barksdale concurred separately in Part I of Judge King's opinion, but dissented to Part II; he was joined by Judges Jolly, Jones, Smith, Garza and DeMoss. Judge Reavley, joined by Chief Judge Politz and Judges Wiener, Benavides, Stewart, Parker and Dennis, dissented. Judge Dennis also wrote a separate dissent. When we have sifted through the wreckage, it is clear that Part I of the *Dunn en banc* decision commanded a majority of the Court (eleven judges).

**21.** Thus, it seems clear that Judge King's analysis was directed towards the *second* prong of the qualified immunity analysis, i.e., whether the officer's actions were "objectively reasonable" under "clearly established law" at the time of the incident in question. As support for that conclusion, we note that Judge King cited to the part of *Harper v. Harris County, Texas* that emphasized "the objective reasonableness of a government official's conduct must be measured *with reference to the law as it existed at the time of the conduct in question.*" *Harper,* 21 F.3d at 601 (emphasis added). Later on that same page, the *Harper* panel chided the district court for "not consider[ing] the seriousness of the alleged injuries in determining whether the officer's conduct was objectively reasonable." *Id.* Such a qualified immunity analysis mirrors that employed by both the panel and *en banc* decisions in *Dunn.*

**22.** We note that as of this date, this Court has never *squarely held* that non-physical injury is sufficient to establish a violation of the Fourth Amendment. A recent panel declined to reach that very issue. *See Ikerd v. Blair,* 101 F.3d 430, 434 & n. 10 (5th Cir.1996).

qualified immunity, whether the other elements of an excessive force claim are clearly established or not.

*Dunn*, 79 F.3d at 405, 407 (Reavley, J., dissenting). The dissent, therefore, did not consider the severity of injury a component of the "clearly established law" determining the "objective reasonableness" of an officer's actions. The dissent defined "clearly established law" at a higher level of generality than the majority, i.e., the law clearly proscribes the use of objectively unreasonable and excessive force by an arresting officer. *Id.* at 405. Judge King criticized the dissent's position as having "no support in the case law." *Id.* at 403 n. 1.

Thus, emerging from the *en banc* decision in *Dunn* is a qualified immunity analysis that, at least for Fourth Amendment excessive force claims, differs slightly from the analysis employed in cases such as *Coon, Jefferson* and *Lynch*. *See* discussion *supra* Part III.B.1. The principal difference, as we appreciate it, is that *Dunn* relies on the severity of injury not only in defining a constitutional tort under *present* law, but also as an "objective, validating" factor in assessing

the "objective reasonableness" of an officer's conduct.[23] Irrespective, however, of the difference between *Dunn*'s analysis and the qualified immunity cases going before it, *Dunn* currently governs in this Circuit a qualified immunity analysis in the context of a Fourth Amendment excessive force claim.[24]

### 4.

■ *Dunn* does not end our inquiry, however. *Dunn* addressed a claim for excessive force grounded in the *Fourth* Amendment. *See Dunn*, 79 F.3d at 402, 54 F.3d at 249. As we observed, *supra*, the district court in this case dismissed the Petta children's Fourth Amendment claims on finding that they had not been "seized." *See supra* note 2 and accompanying text. Their remaining claims, then, are grounded in the due process clause of the Fourteenth Amendment. *See Graham*, 490 U.S. at 395 n. 10, 109 S.Ct. at 1871 n. 10.[25] The question remains, then, whether *Dunn* also affects a Fourteenth Amendment excessive force claim arising during an *attempted* but ulti-

---

23. *Compare Dunn*, 79 F.3d at 403 (relying on severity of injury as "objective, validating event" in assessing objective reasonableness of officer's actions), *with Jefferson*, 817 F.2d at 305 (assessing school officials' defense of qualified immunity without considering severity of plaintiff's injury); *Lynch*, 810 F.2d at 1375–76 (relying on severity of injury as one of three factors in determining whether officers' conduct assumed constitutional dimensions); *Coon*, 780 F.2d at 1163 ("[u]se of excessive force in making an arrest violates clearly established rights, and the doctrine of qualified immunity therefore does not shield an officer who uses excessive force"; addressing qualified immunity defense without considering severity of plaintiff's injuries). *See also Anderson*, 483 U.S. at 639–40, 107 S.Ct. at 3038–39 (intended purpose of qualified immunity defense is to allow officers "reasonably [to] anticipate when *their conduct* may give rise to liability for damages.") (emphasis added).

24. We appreciate that *Dunn* focuses on a narrow legal window (June 5, 1989 to February 25, 1992) and will have increasingly limited applicability over the passage of time. This is doubly true insofar as *Hudson v. McMillian* may have foreclosed using the severity of injury as a determinative factor in delineating constitutional violations. *See, e.g., Dunn*, 79 F.3d at 402–03 ("Counsel for Denk correctly concedes that whatever injury requirement (if any) may remain after

*Hudson* respecting a claim for excessive force in arrest is satisfied here.").

25. In view of the foregoing statement, we find it difficult to understand the dissent's assertion that

the majority fails to acknowledge clearly that an officer's excessive, unreasonable and outrageous use of deadly force against helpless and innocent bystanders such as the Petta children violates their Fourteenth Amendment substantive due process rights; and that, otherwise, innocent bystanders would be shorn of all constitutional rights and have less protection under the constitution and § 1983 tha[n] prisoners, arrestees, and detainees.

*See infra* at 352. On the contrary, we explicitly acknowledge that where a plaintiff's excessive force claim, whether he be a prisoner, arrestee, detainee, or an innocent bystander of tender years, falls outside the specific protections of the Bill of Rights, that plaintiff may still seek redress under the due process clause of the Fourteenth Amendment. *See Graham*, 490 U.S. at 395 n. 10, 109 S.Ct. at 1871 n. 10. The Petta children have done so, and nothing we say here detracts one iota from their constitutional right to do so. The dissent's broad assertions, however, beg the question whether the Petta children's due process claims fall within the parameters of our caselaw defining the scope of their constitutional rights.

mately unsuccessful [26] arrest. Under the specific facts of this case, we must answer in the affirmative; therefore, we find that in January, 1990, the Petta children did not have a "clearly established" due process right to be free from excessive force resulting in purely psychological harm.

Our inquiry here is very narrow. We are *not* asking whether the Petta children's psychological injuries *were* redressable under the Fourteenth Amendment in January, 1990. We are merely asking whether a § 1983 plaintiff at that time had a *clearly established* right under the Fourteenth Amendment to be free from purely emotional harm resulting from an officer's use of excessive force. We have already demonstrated (*see* discussion *supra* Part III.B.3) that such a right was *not* clearly established in January, 1990, under the *Fourth* Amendment. What we hold here is simply that the same right was equally "unclear" (for qualified immunity purposes) under the *Fourteenth* Amendment. We do so for essentially two reasons: (1) our cases following *Graham v. Connor* do not clearly distinguish between Fourth and Fourteenth Amendment analyses in this context; we are thus persuaded that *Johnson v. Morel* and *Dunn v. Denk* (*see* discussion *supra* Part III.B.3), although admittedly addressing the Fourth Amendment right, also affected [27] the Fourteenth Amendment right to be free from excessive force; and, (2) *under the particular facts here,* we see no principled reason for drawing an analytical distinction between the Petta children's due process claim and an arrestee's Fourth Amendment claim, given the substantially similar concerns implicated by the two claims (e.g., the right to be free from excessive force in an arrest situation and the need for a police officer to use reasonable force in effecting arrests).

Prior to *Graham,* no consistent attempt was made to cabin excessive force claims under the Fourth, Eighth or Fourteenth Amendments. Thus, the *Shillingford* standard was applied to excessive force cases regardless of which constitutional amendment was implicated. *See, e.g., Brumfield v. Jones,* 849 F.2d 152, 156 (5th Cir.1988) (Fourth Amendment); *Lynch,* 810 F.2d at 1375 (due process clause); *Jamieson v. Shaw,* 772 F.2d 1205, 1210 (5th Cir.1985) (Fourth Amendment). *See also Stevens v. Corbell,* 832 F.2d 884, 889 (5th Cir.1987) (noting similarity of *Shillingford* standard to *Whitley* Eighth Amendment standard). Following the Supreme Court's guidance in *Graham, see* 490 U.S. at 393–95, 109 S.Ct. at 1870–71, one would have expected three distinct lines of excessive force jurisprudence, i.e., under the Fourth, Eighth and Fourteenth Amendments. To a certain extent, our post-*Graham* cases have distinguished among the respective constitutional amendments in analyzing excessive force claims. *See, e.g., Colston v. Barnhart,* 130 F.3d 96, 99 (5th Cir.1997); *Spann v. Rainey,* 987 F.2d 1110, 1115–16 & n. 8 (5th Cir.1993); *King v. Chide,* 974 F.2d 653, 656–57 (5th Cir.1992). We can discern, however, no clear "line" of Fourteenth Amendment excessive force cases following *Graham* that would clearly establish a different set of standards for such claims.

In fact, our review of Fifth Circuit case law following *Graham* demonstrates a tendency to "blur" the lines between Fourteenth Amendment and either Fourth or Eighth Amendment excessive force standards, depending upon the particular factual context. For example, we held in *Valencia v. Wiggins,* 981 F.2d 1440, 1446 (5th Cir.1993), that a pretrial detainee's excessive force claim, although technically grounded in the Fourteenth Amendment, was properly analyzed

---

**26.** "Unsuccessful" in the sense that the *excessive force* (i.e., shooting at the tires and driving at high speeds) did not result in the arrest. Petta's arrest occurred subsequent to the chase and apparently did not involve excessive force. *See Hinojosa,* 834 F.2d at 1229 n. 7 ("While Hinojosa was arrested, there was no evidence that Jones' pointing of his gun was done to effectuate Hinojosa's arrest."). In any case, Petta does not anywhere allege that excessive force was used

against her or her children when she finally surrendered at her apartment.

**27.** "Affected," in the sense that *Johnson* (as interpreted by *Dunn*) interjected into *both* the Fourteenth and Fourth Amendment excessive force claims "uncertainty" about whether purely nonphysical injury rose to the level of a constitutional violation. *See infra; see also Dunn,* 79 F.3d at 403.

under Eighth Amendment standards. In assessing "what standard of due process" to apply to the plaintiff's claim that a jail official had subjected him to excessive force in quelling a disturbance, we stated:

> [W]e are guided by the standard announced in Whitley and Hudson. While these cases specifically addressed claims of excessive use of force brought by convicted prisoners, it is impractical to draw a line between convicted prisoners [subject to the Eighth Amendment] and pretrial detainees [subject to the Fourteenth Amendment] for the purpose of maintaining jail security.

*Id.* at 1445–46 (brackets added). We noted that the Eighth Amendment standards were useful in this particular Fourteenth Amendment context because of the similar concerns implicated "whenever guards use force to keep order." *Id.* at 1446, *quoting Hudson,* 503 U.S. at 6, 112 S.Ct. at 998. *See also Jackson v. Culbertson,* 984 F.2d 699, 700 (5th Cir.1993); *Bender v. Brumley,* 1 F.3d 271, 277–78 (5th Cir.1993); *Nerren v. Livingston Police Department,* 86 F.3d 469, 472–73 (5th Cir.1996) (cases following *Valencia* and applying Eighth Amendment standards to excessive force claims of arrestees and pretrial detainees).

Similarly, we have applied Fourth Amendment standards to excessive force claims that may have in part implicated the due process clause. For example, in *Mouille v. City of Live Oak,* 918 F.2d 548 (5th Cir.1990), we addressed the excessive force claims of several plaintiffs whom a police officer had allegedly terrorized when he burst into an office building in search of a suspect. *Id.* at 550. Only one of the plaintiffs was arrested; the others were mere bystanders subjected to the officer's violent behavior. *Id.* We addressed all of the excessive force claims under the Fourth Amendment, observing that

> [t]he Supreme Court has stated that *"all* claims that law enforcement officers have

used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment...."

*Id., quoting Graham,* 490 U.S. at 395, 109 S.Ct. at 1871. We did not consider whether all of the plaintiffs were "seized" within the meaning of the Fourth Amendment. It is at least arguable, however, that some of the plaintiffs in *Mouille* were not "seized" and that, therefore, their claims would have been more properly analyzed under the due process clause. *See Brower v. Inyo County,* 489 U.S. 593, 596–97, 109 S.Ct. 1378, 1381–82, 103 L.Ed.2d 628 (1989) [28]; *Graham,* 490 U.S. at 395 n. 10, 109 S.Ct. at 1871 n. 10. *See also Ikerd,* 101 F.3d at 433 n. 6 (applying Fourth Amendment standards to excessive force claim where police officer grabbed child's arm; child's father, and not the child herself, was the object of the arrest); *Stroik v. Ponseti,* 35 F.3d 155, 156–57 (5th Cir.1994) (applying Fourth Amendment to excessive force claim where hostage was shot by police officer as officer fired at her captor).

It is not our intention, however, to find fault with cases like *Mouille, Ikerd* and *Stroik.* We simply observe that, just as we have sometimes used the Eighth Amendment to guide our due process standards in certain excessive force cases, we have likewise used Fourth Amendment standards in cases that, at least in part, implicated substantive due process. Such a practice seems to us driven partly by precedent and partly by policy concerns.

As we have already discussed (*see supra* Part III.B.1), the excessive force claim originated in the undifferentiated context of the due process clause, "quite apart from any 'specific' of the Bill of Rights." *Johnson v. Glick,* 481 F.2d 1028, 1032 (2nd Cir.1973). We had no reason to differentiate among the

**28.** For example, plaintiff Laurie Rollins was allegedly pushed by the police officer into a wall as he searched for the suspect Mouille. *Mouille,* 918 F.2d at 550. Plaintiff Grace Rollins was not touched or otherwise targeted by the officer at all; she only claimed that the officer had "terrified" her by abusing her daughter. *Id.* at 554.

Arguably, both plaintiffs' claims did not implicate the Fourth Amendment because they were not "seized" by the officer, i.e., the officer did not detain either plaintiff "through means intentionally applied." *See Brower,* 489 U.S. at 596–97, 109 S.Ct. at 1381–82. The officer apparently did not intend to arrest or question either plaintiff.

amendments until *Graham*[29] in 1989; thus, it comes as little surprise that the standards continue to "overlap" somewhat. *See, e.g., Nerren,* 86 F.3d at 473 n. 20 (noting "overlap" of arrestee's Fourth Amendment rights with his due process rights); *Valencia,* 981 F.2d at 1449 n. 44 (noting "continued convergence of the various tests under the Fourth, Eighth and Fourteenth Amendments for maltreatment of arrestees, detainees or convicted prisoners, respectively."). Such an "overlap" is borne out, in our view, by cases such as *Harper,* where we held that *Hudson v. McMillian*'s removal of the "significant injury" requirement from the Eighth Amendment standard also affected the *Johnson v. Morel* Fourth Amendment standard. *See Harper,* 21 F.3d at 600; *see also Oliver v. Collins,* 914 F.2d 56, 59 n. 1 (5th Cir.1990) (pre-*Hudson,* looking to *Johnson v. Morel* and its Fourth Amendment standard "in determining whether a particular injury is of sufficient magnitude to invoke Eighth Amendment protection. . . .").

Underlying policy concerns may also explain the apparent "overlap." In cases such as *Valencia* and its progeny, *supra,* we borrowed Eighth Amendment standards in treating excessive force claims under the due process clause. We did so because the concerns vindicated by a convicted prisoner's excessive force claim under the Eighth Amendment and those vindicated by a pretrial detainee's excessive force claim under the due process clause are largely the same: the need to guide the proper application of force in maintaining jail security. *See Valencia,* 981 F.2d at 1446. We therefore adjudged it "impractical" to adopt different criteria for pretrial detainees, even though their claims are brought under the Fourteenth Amendment. *Id.*

The same reasoning applies to the Petta children's claims. We find it impractical and illogical to draw a line between their due process claims and those of an arrestee who claims, under the Fourth Amendment, that a police officer has used excessive force in effecting his arrest. Whether Officer Rivera's use of force was "objectively reasonable" largely implicates Fourth Amendment concerns,[30] even though the fortuity of his bullet going astray removed this case from the purview of "seizure" cases. *See Brower,* 489 U.S. at 596–97, 109 S.Ct. at 1381–82.

This could well mean that the *present* constitutional standards for the Petta children's claims are governed by the Fourth Amendment "reasonableness" standard of *Tennessee v. Garner* (*see supra* notes 14 & 29). But, as we have observed above (*supra* Part III.A.1), we need not decide that question today. We simply observe that our precedents, such as *Johnson v. Morel, supra,* and *Dunn v. Denk, supra,* interjected as much uncertainty into our *Fourteenth* Amendment

---

**29.** A literal application of *Graham* to all claims of excessive force used *"in the course of* an arrest, investigatory stop or other 'seizure,' "* 490 U.S. at 395, 109 S.Ct. at 1871 (emphasis added), could result in application of the Fourth Amendment to situations partially covered by the due process clause. For example, in *Hinojosa,* (*supra* Part III.B.3) the police officer allegedly used excessive force (waving a gun in the plaintiff's face) *"in the course of"* an arrest; we applied due process standards because the excessive force used was separate from, and did not result in, the plaintiff's arrest. *See Hinojosa,* 834 F.2d at 1229 n. 7. A strict adherence to *Graham*'s language, however, would mandate application of the *Fourth* Amendment in *Hinojosa.* Indeed, it would seem that our decisions in *Mouille, Stroik* and *Ikerd, supra,* adopt that approach. While we agree that the quoted language from *Graham, supra,* does support such a broad application of the Fourth Amendment, we merely observe here that footnote 10 in *Graham* could arguably be read to limit application of Fourth Amendment standards to those situations in which an officer has "by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen." *Graham,* 490 U.S. at 395 n. 10, 109 S.Ct. at 1871 n. 10 *citing Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1878 n. 16, 20 L.Ed.2d 889 (1968) *and Brower,* 489 U.S. at 596, 109 S.Ct. at 1381. We submit that footnote 10 represents a *narrower* view of the applicability of the Fourth Amendment than the language quoted in *Mouille, supra. See also Rankin,* 5 F.3d at 107 n. 3.

**30.** For example, were we to weigh the reasonableness of Rivera's shooting at Petta's car and engaging her in a high speed chase, we would be interested, *inter alia,* in the severity of Petta's crime, in whether her flight "pose[d] an immediate threat to the safety of the officers or others," and whether Petta was "actively resisting arrest or attempting to evade arrest by flight." *See Graham,* 490 U.S. at 396, 109 S.Ct. at 1871 *citing Tennessee v. Garner,* 471 U.S. at 8–9, 105 S.Ct. at 1699–1700.

jurisprudence as into our Fourth Amendment jurisprudence, regarding whether a purely non-physical injury rose to the level of a constitutional violation.[31]

We have observed before that the qualified immunity analysis partakes of a somewhat "schizophrenic" nature. *See Rankin*, 5 F.3d at 109. This case aptly demonstrates that phenomenon. In assessing Officer Rivera's defense of qualified immunity, we must assess the law as it stood some eight years ago, even when our case law may have now moved on. We must therefore hold that in January, 1990, the Petta children had no "clearly established" constitutional right under the due process clause to be free from a police officer's use of excessive force where the only injuries allegedly suffered were psychological. We therefore find that the district court erred in denying Officer Rivera's motion for summary judgment based on the defense of qualified immunity.

## IV.

For the foregoing reasons, we REVERSE the judgment of the district court and RENDER judgment, granting Officer Rivera's motion for summary judgment based on the defense of qualified immunity.

REVERSED AND RENDERED.

DENNIS, Circuit Judge, dissenting:

The majority holds that a police officer who knowingly and maliciously or wantonly fired his .357 magnum at a family suburban automobile containing two helpless and innocent bystander children, ages 3 and 7, endangering their lives with deadly force and causing them severe psychological damage, merely to serve routine traffic tickets on the children's mother, is entitled to qualified immunity.

I respectfully dissent for the following reasons: (1) Officer Rivera's misbehavior was so egregious and so clearly violated the Petta children's Fourteenth Amendment substantive due process rights that no prior judicial precedent was required to clearly establish their action under 42 U.S.C. § 1983; (2) Moreover, although by no means essential to the Petta children's present cause, before Rivera's violation of their rights this court had recognized § 1983 actions on behalf of young children who sustained serious psychological damage as the result of violations of their Fourteenth Amendment substantive due process rights under circumstances closely analogous to the facts of the present case; (3) The cases relied upon by the majority to show that the Petta children's Fourteenth Amendment substantive due process rights violated by Rivera were not clearly established are inapposite, clearly distinguishable and would have no effect upon the fact that a reasonable officer in Rivera's situation would know or should know that the egregious abusive and excessive conduct engaged in by Rivera was a violation of the Petta children's constitutional rights.

After a review of the record and the law, I conclude that Rivera's motion for summary

---

**31.** We do not quarrel with the dissent's assertion that the Petta children need not "point to a precisely and explicitly analogous case that existed prior to an officer's violation of the plaintiff's constitutional rights" in order to defeat Officer Rivera's claim of qualified immunity. *See infra* at 355; *see also* discussion *supra* Part II, *citing Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039. Again, however, that statement merely begs the question whether Officer Rivera's actions violated constitutional rights "clearly established" at the time of those actions. The dissent fails to consider that our precedent was not only unclear about the parameters of a Fourteenth Amendment excessive force claim, but that it also failed to clearly distinguish between Fourth and Fourteenth Amendment standards for such claims. *See* discussion *supra* Parts III.B.3 & III.B.4.

More importantly, however, the dissent disregards the effect on the plaintiffs' due process rights of our *en banc* decisions in *Johnson v. Morel, supra,* and *Dunn v. Denk, supra,* merely finding the reasoning in those cases "inapposite" because they were decided under the Fourth Amendment. *See infra* at 356–57. Our discussion in Part III.B.4 demonstrates that the excessive force claim did not originate, nor does it presently exist, in neat, hermetically-sealed categories according to which constitutional amendment the claim implicates. Instead, cases arising under one amendment have consistently affected the parameters of rights that, while arising under different constitutional amendments, implicate similar policy concerns. *See* Part III.B.4; *see also Harper,* 21 F.3d at 600; *Valencia,* 981 F.2d at 1445–46. The dissent does not consider that phenomenon and thus fails to appreciate both the practical and theoretical underpinnings of our excessive force jurisprudence.

judgment based on qualified immunity was properly denied by the district court because (1) the Petta children have stated a valid claim that their constitutional rights were violated under currently applicable standards and (2) the Petta children have shown that Rivera's actions were objectively unreasonable under the clearly established law at the time of the incident in question. Therefore, I would affirm the district court's ruling and remand for further proceedings.

## I.

On summary judgment the inferences to be drawn from the underlying facts contained in the affidavits, depositions, and exhibits of record must be viewed in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). Accordingly, construing the record on motion for summary judgment in the light most favorable to the plaintiffs, the Petta children, I infer the following facts.

On January 15, 1990, Patrolman Rivera stopped Ms. Petta for speeding as she was driving her 1983 Chevrolet Suburban on Farm Road 70 toward Corpus Christi where she and her family resided. Ms. Petta's son Cavin, age 3, was in the front passenger seat with his seat-belt fastened, and her daughter Nikki, age 7, was in the back seat. At Rivera's request, Petta handed over her driver's license and registration. Rivera accused Petta of driving 69 miles per hour, but Petta disagreed, contending she had been going only 63 miles per hour. Rivera told Petta not to argue with him. Petta responded that Rivera should just give her a speeding ticket and let her depart. She added that she would tell her story to the arraigning judge, whom she knew. In response, Rivera told her not to tell him how to do his job. Petta replied that he would lose his job if he didn't "get a grip" and again requested a speeding ticket.

Rivera noticed that Cavin's seat belt was not fastened and told Petta her failure to have the child secured in a safety restraint was also a traffic law violation. As Petta began to explain that Cavin had been wearing his seat belt before the stop, Rivera

walked back to his police car. He quickly returned in a more aggressive mood, however, and demanded that Petta get out of her car. She refused because she was frightened that Rivera might harm her or separate her from her children. He demanded that she roll down her window. She refused, shaking her head. Rivera angrily tried to jerk open her locked car door, saying "Get out of the car, Bitch." Becoming more alarmed, she refused again. Rivera shouted through the closed window that he would have her vehicle towed away. Petta responded, "I'll leave first. You know where to find me." Petta was referring to the fact that Rivera still had her driver's license and registration containing her home address. Rivera got back in his car and pulled it in front of Petta's Suburban. She backed up and pulled the Suburban in front of Rivera's vehicle. Rivera jumped from his car, and began to beat on Petta's window with his night stick, shouting repeatedly "Get out of the car, Bitch," and "I'm going to break the window." Both children had become very frightened, and Nikki kept repeating, "Mom, he's breaking the window!" Rivera shouted, "They're coming to get you. They're coming right now. They're All coming." Finally, Rivera took out his .357 magnum revolver, pointed it at Petta's face and said, "Then I'll just have to kill you, Bitch!" Petta panicked and drove off in the Suburban.

As Petta fled with her children, Rivera chased after them and fired a shot with his .357 at the Petta vehicle. Cavin was groaning and shaking. In the rearview mirror, Petta saw Rivera aim his revolver at her vehicle as she traveled at speeds of up to 85 mph. Soon after, she saw Rivera pull out a shotgun and aim toward her vehicle. As they approached Corpus Christi, additional law enforcement vehicles joined the chase. Petta was able to avoid being stopped, however, by weaving through city streets toward her home. At one point, as she slowed to make a turn, Rivera fired another .357 shot at her vehicle. Nikki cried out, "Mom, he's shooting again!" Ultimately, Petta arrived at her apartment and sent the children into the dwelling to their father. Cavin was crying hysterically. Rivera and

the other pursuing officers arrived, arrested and handcuffed Petta, and took her to the police station.

The evidence filed by Rivera disputes many of these facts. But in some important respects it reinforces inferences drawn in the light most favorable to the nonmoving parties.

The police radio log of events indicates that at 4:49 p.m. Rivera relayed to the dispatcher his location, a description of the Petta vehicle, and its license plate number, TX 7282–MX. Rivera called for a wrecker at 4:54 PM, stating the "subject failed to get out of the vehicle.... it's a hysterical female, she refuses to follow orders." At 4:58 p.m., he informed the dispatcher that he was in pursuit of the vehicle, and at 4:59 PM he relayed Petta's driver's license no., TX 09216602. At 5:01, this exchange occurred:

Rivera: ... subject does have a child in the vehicle also. I will, I was gonna attempt to shoot out the tires, I'm not at this point.

Dispatcher: Corpus Christi, 3112, 3100 [Rivera's superior officers] advises negative, not if there's a child aboard.

Rivera: 10–4.

The radio log and the record as a whole overwhelmingly support the inference that Rivera nevertheless fired his .357 magnum at the Petta vehicle after receiving his superior officer's order not to do so. At 5:18 p.m., an officer Martinez broadcast "pursuit terminated," indicating that Petta had been arrested.

In his deposition, Rivera admitted that he had no reason to believe that Petta was a dangerous person or was wanted for anything other than the speeding violation; that he rapped on her window 15 times or so with his baton; that he drew his revolver and aimed at the Petta vehicle when she drove away; that he shot at the Petta vehicle's tire with his .357 during the chase; and that he shot at the Petta vehicle after the radio dispatcher had relayed a direct order from his superior officer forbidding him to shoot at the vehicle because there was a child aboard. In his deposition, James Cleland, a cadet riding with Rivera during the episode, testified that at the time the chase began, Rivera had Petta's driver's license, vehicle registration, and license plate number in his possession; that before the chase began Rivera had no reason to believe that Petta was a dangerous person or was wanted for any reason other than the speeding violation.

As the result of a Department of Public Safety disciplinary inquiry it was found that Rivera had been ordered by his superior officer not to fire on the Petta vehicle because there was a child on board and because of the threat of harm to bystanders in the city and that Rivera had disobeyed this direct order. Further, the officers who investigated the incident found that Rivera had lost control of the situation and placed the Department in a very precarious position; that there was no reason to continue the pursuit; that there was no reason to discharge his weapon at the vehicle; and that Rivera did not take into consideration the consequences of his actions concerning the passengers in the vehicle or innocent bystanders.

Following the incident, Petta brought suit in the district court alleging that Rivera had used excessive force in violation of the Fourth Amendment and had also deprived Nikki and Cavin of their Fourteenth Amendment substantive Due Process rights. She seeks compensatory and punitive damages for Nikki and Cavin's injuries due to the mental anguish and serious psychological harm they suffered as a result of the violations. The children are not alleged to have suffered any physical harm as a result of the incident. Rivera filed a motion to dismiss or, in the alternative, for summary judgment, as to all of Petta's claims asserting his defense of qualified immunity. In addition, defendant TDPS filed a motion to dismiss on the basis of its Eleventh Amendment immunity.

The district court dismissed Petta's claims against defendant TDPS on the basis of Eleventh Amendment immunity. Additionally, the court granted Rivera's motion for summary judgment on Petta's Fourth Amendment claims, determining that the children had not been seized and were not the object of the pursuit. The court further found that because Rivera had not raised the issue of his qualified immunity from Petta's Fourteenth Amendment claim, he had thus

not moved for dismissal or summary judgment on Petta's Fourteenth Amendment due process claim.

Rivera filed a supplemental motion for summary judgment on the Petta children's due process claim, again asserting his defense of qualified immunity. The district court denied Rivera's motion on the Petta children's claims under the Fourteenth Amendment without explanation. Subsequently, Rivera filed a motion for reconsideration of the court's order denying his motion for summary judgment. However, before the court ruled upon his motion for reconsideration, Rivera filed a timely notice of appeal from the court's denial of his motion for summary judgment. The district court then denied Rivera's motion for reconsideration and this appeal followed.[1]

## II.

Under 42 U.S.C. § 1983, every person who, under color of any statute, ordinance, regulation, custom, or usage, of any state, subjects, or causes to be subjected, any citizen of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. Therefore, when a state officer acts under a state law in a manner violative of the Federal Constitution, he comes in conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. *Scheuer v. Rhodes*, 416 U.S. 232, 237, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Although § 1983 on its face admits of no immunities, the Supreme Court has read it in harmony with general principles of tort immunities and defenses rather than in derogation of them. *Imbler v. Pachtman*, 424 U.S. 409, 418, 96 S.Ct. 984, 989, 47 L.Ed.2d 128 (1976).

The Supreme Court cases have generally provided government officials performing discretionary functions with a qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated. *Anderson v. Creighton*, 483 U.S. 635, 638–639, 107 S.Ct. 3034, 3038–3039, 97 L.Ed.2d 523 (1987) (citing *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)); *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984); *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the "objective legal reasonableness" of the action, assessed in light of the legal rules that were "clearly established" at the time it was taken. *Anderson*, 483 U.S. at 639, 107 S.Ct. at 3038 (quoting *Harlow*, 457 U.S. at 818–819, 102 S.Ct. at 2738–2739).

In assessing a claim of qualified immunity, the court engages in a bifurcated analysis. *See Rankin v. Klevenhagen*, 5 F.3d 103, 105 (5th Cir.1993) (citing *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir.1992)). Qualified immunity is a defense that must be pleaded by a defendant official. Once a defendant pleads a defense of qualified immunity, " '[o]n summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred.' " *Siegert v. Gilley*, 500 U.S. 226, 231, 111 S.Ct. 1789, 1792, 114 L.Ed.2d 277 (1991) (quoting from *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738). The first inquiry is whether the plaintiff has asserted a violation of a constitutional right at all. *Siegert v. Gilley*, 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). If so, we then decide whether the constitutional right asserted by the plaintiff was "clearly established" at the time the defendant acted. *Id.*

Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738.

---

1. I agree with the majority's conclusion that this court has jurisdiction to hear this appeal.

Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment. *Id.* If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful. *Id.; Cf. Anderson,* 483 U.S. at 640, 107 S.Ct. at 3038 ("This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in light of pre-existing law the unlawfulness must be apparent.") (internal citations omitted). If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct. *Harlow,* 457 U.S. at 818–819, 102 S.Ct. at 2738–2739; *See Spann v. Rainey,* 987 F.2d 1110, 1114 (5th Cir.1993) (quoting *Salas,* 980 F.2d at 310).

## III.

The substantive due process claim for excessive force under § 1983, and the standard for judging such a claim, were first recognized in *Johnson v. Glick,* 481 F.2d 1028 (2nd Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973) in which the Court of Appeals for the Second Circuit addressed such a claim by a pretrial detainee who asserted that a guard had assaulted him without justification. In evaluating the detainee's claim, Judge Henry J. Friendly looked to "substantive due process," holding that "quite apart from any 'specific' of the Bill of Rights, application of undue force by law enforcement officers deprives a suspect of liberty without due process of law." *Glick,* 481 F.2d, at 1032. In support, he relied on the Supreme Court's decision in *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), which used the Due Process Clause to void a state criminal conviction based on evidence obtained by pumping the defendant's stomach. *Glick,* 481 F.2d at 1031–1033. If a police officer's use of force which "shocks the conscience" could justify setting aside a criminal conviction, the *Glick* court reasoned, a correctional officer's use of similarly excessive force must give rise to a due process violation actionable under § 1983. *Id.* Judge Friendly went on to set forth four factors to guide courts in determining "whether the constitutional line has been crossed" by a particular use of force:

> [A] court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.

*Id.* at 1033; *see Graham v. Connor,* 490 U.S. 386, 392, 109 S.Ct. 1865, 1869, 104 L.Ed.2d 443 (1989). The vast majority of federal courts have followed *Johnson v. Glick,* applying its four-part "substantive due process" test to all excessive force claims lodged against law enforcement and prison officials under § 1983. *Graham v. Connor,* 490 U.S. at 393, 109 S.Ct. at 1869 (citing, Freyermuth, *Rethinking Excessive Force,* 1987 Duke L.J. 692, 694–696, and nn. 16–23 (1987) (collecting cases)).

In *Shillingford v. Holmes,* 634 F.2d 263 (5th Cir. Unit A 1981) this court of appeals adopted its own version of the *Johnson v. Glick* standard for judging an innocent "bystander's" claim under substantive due process and § 1983 for excessive use of force by a police officer. Officer Holmes had used his nightstick to strike Shillingford, a tourist who was photographing the arrest of a boy during a Mardi Gras parade, smashing the camera into Shillingford's face and lacerating his forehead. Shillingford was not involved in the arrest incident and did not interfere with the police in any fashion. The *Shillingford* court borrowed terminology from *Johnson v. Glick,* as well as *Hall v. Tawney,* 621 F.2d 607 (4th Cir.1980) and restated the standard as follows:

> In determining whether the state officer has crossed the constitutional line that would make the physical abuse actionable under Section 1983, we must inquire into the amount of force used in relationship to

the need presented, the extent of the injury inflicted and the motives of the state officer. If the state officer's action caused severe injuries, was grossly disproportionate to the need for action under the circumstances and was inspired by malice rather than merely careless or unwise excess of zeal so that it amounted to an abuse of official power that shocks the conscience, it should be redressed under Section 1983. *Hall v. Tawney,* 621 F.2d at 613; *Johnson v. Glick,* 481 F.2d at 1033.

*Shillingford,* 634 F.2d at 265. Thus, this court added the requirement of "severe injury," contained in the *Hall v. Tawney* formulation, to the original *Johnson v. Glick* test.

The *Shillingford* court found that because the officer's assault was unprovoked and unjustified, was committed merely to prevent the bystander plaintiff from photographing what the officer did not want memorialized, and could have caused the plaintiff permanently disabling eye or head injuries, "the physical abuse [was] sufficiently severe, sufficiently disproportionate to the need presented and so deliberate and unjustified a misuse of the policeman's badge and bludgeon as to transcend the bounds of ordinary tort law and establish a deprivation of constitutional rights." *Id.* at 266.

Subsequently, the *Shillingford v. Holmes* standard was rendered inapplicable to certain types of claims by *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) and by analogy was altered with respect to all other claims by *Hudson v. McMillian,* 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). In *Graham v. Connor,* the Court held that the validity of an excessive force claim arguably based upon a violation of a specific protection of the Bill of Rights, such as those contained in the Fourth and Eighth Amendments, must be judged by reference to the specific standard which governs that right rather than by the more general substantive due process standard. In *Hudson v. McMillian,* the Court held that the use of excessive force against a prisoner may constitute cruel and unusual punishment under the Eighth Amendment even though the inmate does not suffer serious injury.

In *Graham v. Connor,* the Supreme Court rejected the notion that all excessive force claims brought under § 1983 are governed by a single generic standard. *Id.* at 393, 109 S.Ct. at 1869. Instead, in addressing an excessive force claim brought under § 1983, analysis begins by determining whether the challenged application of force is properly examined with reference to a specific constitutional right. *Id.* at 394, 109 S.Ct. at 1870 (citing *Baker v. McCollan,* 443 U.S. 137, 140, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433 (1979)). If so, the validity of the claim must be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized "excessive force" standard. *Id.* at 394, 109 S.Ct. at 1870 (citing *Tennessee v. Garner,* 471 U.S. 1, 7–22, 105 S.Ct. 1694, 1699–1706, 85 L.Ed.2d 1 (1985) (claim of excessive force to effect arrest analyzed under a Fourth Amendment standard)); *Whitley v. Albers,* 475 U.S. 312, 318–326, 106 S.Ct. 1078, 1083–1087, 89 L.Ed.2d 251 (1986) (claim of excessive force to subdue convicted prisoner analyzed under an Eighth Amendment standard).

The *Graham* Court decided that claims that law enforcement officials have used excessive force in the course of an arrest, investigatory stop, or other "seizure" of a free citizen are most properly characterized as invoking the protections of the Fourth Amendment, and must be judged by reference to the Fourth Amendment's "reasonableness" standard. *Id.* at 394–395, 109 S.Ct. at 1870–1871. Explicitly, the court stated:

> [A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard rather than under a "substantive due process" approach. Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.

*Graham,* 490 U.S. at 395, 109 S.Ct. at 1871.

In the appeal and record before us the plaintiffs do not present a claim on behalf of

the Petta children under § 1983 based on a violation of their Fourth Amendment rights. The appellees do not allege a factual basis for finding that the officer used excessive force in the course of an arrest, investigatory stop, or other "seizure," of the children. A "seizure" triggering the Fourth Amendment's protections occurs only when government actors have, by means of physical force or show of authority, in some way restrained the liberty of a citizen. *Graham,* 490 U.S. at 395 n. 10, 109 S.Ct. at 1871 n. 10 (citing *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1878 n. 16, 20 L.Ed.2d 889 (1968)); *Brower v. County of Inyo,* 489 U.S. 593, 596–597, 109 S.Ct. 1378, 1381–1382, 103 L.Ed.2d 628 (1989) ("[A] Fourth Amendment seizure [occurs] only when there is a governmental termination of freedom of movement *through means intentionally applied."*) (emphasis in original); *see also California v. Hodari D.,* 499 U.S. 621, 626, 111 S.Ct. 1547, 1550, 113 L.Ed.2d 690 (1991) ("The word 'seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful.... An arrest requires either physical force (as described above) or, where that is absent, *submission* to the assertion of authority."). In this case, the Petta children were merely bystanders in the episode, were not physically touched or restrained, and were not called upon to stop under a show of authority by the officer; and, of course, the children did not submit to an assertion of authority.

The majority opinion implicitly recognizes that the Petta children do not present a § 1983 claim based on an arrest, investigatory stop, or other "seizure" of the children which would invoke a Fourth Amendment violation analysis. Nevertheless, the majority fails to acknowledge clearly that an officer's excessive, unreasonable and outrageous use of deadly force against helpless and innocent bystanders such as the Petta children violates their Fourteenth Amendment substantive due process rights; and that, otherwise, innocent bystanders would be shorn of all constitutional rights and have less protection under the constitution and § 1983 that prisoners, arrestees, and detainees.

While the Supreme Court in *Graham* did reject the substantive due process or more generalized approach, the court did so only in cases in which the alleged excessive use of force arguably violated a *specific* right protected under the Bill of Rights. With respect to free citizens, the court explicitly held only that all "claims that law enforcement officers have used excessive force—deadly or not—*in the course of an arrest, investigatory stop, or other 'seizure'* " should be analyzed under the Fourth Amendment. *Graham,* 490 U.S. at 395, 109 S.Ct. at 1871 (emphasis added); *See United States v. Lanier,* 520 U.S. ——, —— n. 7, 117 S.Ct. 1219, 1228 n. 7, 137 L.Ed.2d 432 (1997) ("*Graham v. Connor,* [*supra.*] does not hold that all constitutional claims relating to physically abusive government conduct must arise under either the Fourth or Eighth Amendment, rather, *Graham* simply requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process."). Further, the court explicitly stated that "[a] 'seizure' triggering the Fourth Amendment's protections occurs only when government actors have, 'by means of physical force or show of authority.... in some way restrained the liberty of a citizen'." *Id.* at 396 n. 10, 109 S.Ct. at 1871 n. 10 (quoting from *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1878 n. 16, 20 L.Ed.2d 889 (1968)). Moreover, the court specifically noted that:

> Our cases have not resolved the question whether the Fourth Amendment continues to provide individuals with protection against the deliberate use of excessive physical force beyond the point at which arrest ends and pretrial detention begins, and we do not attempt to answer that question today. It is clear, however, that the Due Process clause protects a pretrial detainee from the use of excessive force that amounts to punishment. *See Bell v. Wolfish,* 441 U.S. 520, 535–539, 99 S.Ct. 1861, 1871–1874, 60 L.Ed.2d 447 (1979).

*Graham,* 490 U.S. at 396, n. 10, 109 S.Ct. at 1871, n. 10.

Accordingly, I would find, as have all of the courts of appeals that have addressed the issue, that a plaintiff whose claim is not susceptible to proper analysis with reference to a specific constitutional right, such as the Petta children, may still state a claim under § 1983 for a violation of his or her Fourteenth Amendment substantive due process right, and have the claim judged by the constitutional standard which governs that right. *See Landol–Rivera v. Cruz Cosme,* 906 F.2d 791, 796 (1st Cir.1990) ("We assume that claims of excessive force outside the context of a seizure still may be analyzed under substantive due process principles."); *Pleasant v. Zamieski,* 895 F.2d 272, 276 n. 2 (6th Cir.1990) ("[P]resumably this imperative would preserve fourteenth amendment substantive due process analysis for those instances in which a free citizen is denied his or her constitutional right to life through means other than a law enforcement official's arrest, investigatory stop or other seizure."); *Sinaloa Lake Owners Assoc. v. City of Simi Valley,* 882 F.2d 1398, 1408 n. 10 (9th Cir. 1989) (Graham does not, however, bar substantive due process analysis altogether. "A plaintiff may still state a claim for violation of substantive due process where it is alleged that the government has used its power in an abusive, irrational or malicious way in a setting not encompassed by some other enumerated right."); and *Wilson v. Northcutt,* 987 F.2d 719, 722 (11th Cir.1993) ("[W]e hold that a non-seizure Fourteenth Amendment substantive due process claim of excessive force survives Graham.").

## IV.

In determining whether the Petta children have asserted a violation of a currently extant constitutional right at all, the Supreme Court's decision in *Hudson v. McMillian* requires that this court dispense with the "severe injury" requirement of the *Shillingford v. Holmes* substantive due process standard. In *Hudson* the Court held that (1) the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth amendment; (2) the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on whether force was ap-

plied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm; (3) the extent of injury suffered by an inmate is one factor that may suggest whether the use of force could plausibly have been thought necessary or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur; (4) in determining whether the use of force was wanton or unnecessary, it may also be proper to evaluate the need for its application, the relationship between that need and the amount of force used, the threat reasonably perceived by responsible officials and any efforts made to temper the severity of a forceful response; and (5) the absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it. *Hudson,* 503 U.S. at 5–7, 112 S.Ct. at 997–998.

This court of appeals has acknowledged that the *Hudson* rationale requires the elimination of the "significant injury" requirement that had been added to the objective reasonableness test for purposes of assessing the validity of Fourth Amendment excessive force claims. *Dunn v. Denk,* 79 F.3d 401 (5th Cir.1996) (*en banc*); *Harper v. Harris County, Texas,* 21 F.3d 597 (5th Cir.1994).

By the same token, in the wake of *Hudson* there is no justifiable basis for maintaining the "severe injury" requirement as part of the standard for judging the validity of a substantive due process excessive force claim. This is especially evident because the "unnecessary and wanton infliction of pain" standard that the Supreme Court adopted in *Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) and applied in *Hudson* closely resembles and was derived from the test "articulated by Judge Friendly in *Johnson v. Glick,* ..., a case arising out of a prisoner's claim to have been beaten and harassed by a guard." *Hudson,* 503 U.S. at 7, 112 S.Ct. at 999. Thus, it logically follows from the *Hudson* Court's statement that "[u]nder the Whitley approach, the extent of injury is one factor" to be considered with "the need for application of force, the relationship between that need and the amount of force used" and other factors, that the

extent of injury is only one relevant factor and cannot be exclusively determinative under the *Johnson v. Glick* substantive due process approach either.

Accordingly, I would find that the currently applicable legal standard to be used in analyzing the § 1983 claims of the Petta children, as bystander-plaintiffs, based on the alleged excessive use of force by Officer Rivera in violation of their Fourteenth Amendment substantive due process rights, is the *Shillingford v. Holmes* standard, absent any requirement of severe injury. Therefore, if the Petta children can prove that Rivera's actions caused them injuries, were grossly disproportionate to the need for action under the circumstances and were inspired by malice rather than merely careless or unwise excess of zeal so that it amounted to an abuse of official power that shocks the conscience, they will have stated a valid claim under § 1983 based on a violation of their substantive due process rights under the current standard. *Cf. Shillingford,* 634 F.2d at 265.

Therefore, reviewing the summary judgment evidence in the light most favorable to the nonmoving parties, I find that the answer to the first inquiry—whether the Petta children have asserted a violation of a constitutional right at all under the currently applicable standard—is "yes." To demonstrate that this is so, however, a detailed analysis of the evidence at this point is unnecessary. The second query of the bifurcated analysis—whether the constitutional rights asserted by the Petta children were "clearly established" at the time Rivera acted—raises all of the issues involved in the first inquiry, plus the question of whether the Petta children suffered "severe injuries" because of Rivera's excessive use of force. Therefore, I will proceed directly to the second inquiry.

## V.

On January 15, 1990, our clearly established standard for Fourteenth Amendment substantive due process excessive force claims was *Shillingford v. Holmes,* 634 F.2d 263, 265 (5th Cir.1981). Applying that standard, and drawing the inferences most favorable to the non-moving parties, I would find that a reasonable trier of fact could find that Rivera's actions were "grossly disproportionate to the need for action," "inspired by malice rather than merely careless or unwise excess of zeal," amounted to "an abuse of official power that shocks the conscience," and that, as a result, the Petta children suffered "severe injuries." *Shillingford,* 634 F.2d at 265.

According to the record before us, there is overwhelming evidence that Rivera's actions were "grossly disproportionate to the need for action under the circumstances." *Id.* The only action necessary under the circumstances was the issuance of one or two traffic tickets. If Rivera had performed that act promptly and professionally, the use of excessive force would not have become an issue. Rivera had no reason to suspect that Ms. Petta had committed or was about to commit any offense more serious than a minor traffic violation. He took her driver's license and registration, noted her license plate number, and knew or should have known that she was headed to her home a short distance away. Under these circumstances it was entirely unnecessary for Rivera to use deadly force in an attempt to apprehend Ms. Petta. Rivera's application of lethal and other violent force directed toward the Petta vehicle occupied by Ms. Petta and her small children, both before and during the chase, was grossly disproportionate under the circumstances, viz., his shooting .357 magnum bullets at the car, threatening to kill Ms. Petta while aiming his revolver at her, bludgeoning the car's window, attempting forcibly to enter the vehicle, threatening to have it towed with the Pettas inside, and chasing the Petta vehicle at high speeds.

Drawing factual inferences in the non-movants' favor, a reasonable trier of fact could find that Rivera acted out of conscience-shocking malice or wantonness rather than merely careless or excessive zeal. Rivera's use of deadly force, other violent acts, threats of death, abusive epithets, demeaning characterizations, and utter disregard for the safety and well being of Ms. Petta and her young children, allow a reasonable inference that he acted with malice, an intent to cause harm, or at least with such wantonness as is

tantamount to a knowing willingness that it occur.

The evidence of record fully supports a reasonable inference that the Petta children have suffered severe and enduring psychological pain, injuries and disabilities as the result of Rivera's use of deadly force and extreme violence in attempting to shoot, break into, and pull over the Petta vehicle, after cursing, yelling at, and threatening to kill their mother. During their ordeal, the children exhibited intense fear as evidenced by Nikki's crying out repeatedly that Rivera was breaking their window and shooting at them, and by Cavin's groaning, shaking, and uncontrollable crying. Even three years after Rivera's attacks, the psychological evaluations recommended by the children's psychiatrist indicate that, as a consequence of the terrorization, Cavin is highly anxious and distressed, perceives himself as delicate and vulnerable, and experiences sleeplessness and separation anxiety at night; Nikki has phobic concerns about angry, mean, or sadistic male figures, feels the world is unsafe, and invests enormous emotional energy into maintaining hypervigilance at the expense of her reasoning and creative abilities. The psychologist recommends continued treatment and counseling for both children to help them cope with their emotional problems.

Reviewing the evidence of record in the light most favorable to the nonmoving parties, I find that the constitutional substantive due process rights asserted by the Petta children under the *Shillingford v. Holmes* standard constituted the "clearly established" law at the time that Rivera acted, that any reasonably competent law enforcement officer should have known that actions such as Rivera's violated the law governing his conduct, and that Rivera's immunity defense should therefore fail.

## VI.

The majority opinion focuses on Rivera's argument that his conduct cannot constitute a Fourteenth Amendment substantive due process violation under § 1983, even if it caused the Petta children severe and enduring psychological damage, because it did not result in any physical injury to them. The majority holds that it was not clearly established in January 1990 that a state officer's wanton or malicious use of unnecessary and excessive force which caused severe psychological damage to a young child was a violation of the child's constitutional rights under the Fourteenth Amendment, unless the child also sustained physical injury in the process. Thus, Rivera, the majority finds, is entitled to qualified immunity as to the Petta children's Fourteenth Amendment claims.

I disagree for three essential reasons.

### a.

That a § 1983 plaintiff cannot point to a precisely and explicitly analogous case that existed prior to an officer's violation of the plaintiff's constitutional rights does not automatically defeat the § 1983 claim. If a qualified immunity defense could succeed simply because the behavior alleged is so egregious that no identical case is on the books, the law would perversely encourage the most flagrant types of official misconduct. As Judge Richard Posner recognized in *K.H. ex rel Murphy v. Morgan,* 914 F.2d 846, 851 (7th Cir.1990), "[t]he easiest cases don't even arise. There has never been a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages liability because no previous case had found liability in those circumstances." The Supreme Court and this Circuit have so held: *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held as unlawful;* but it is to say that in the light of pre-existing law the lawfulness must be apparent.") (emphasis added); *Jefferson v. Ysleta Independent School District,* 817 F.2d 303, 305 (5th Cir.1987). If the law were otherwise, qualified immunity would be absolute and no § 1983 claim would exist, because there could never be a previous case finding liability under the same circumstances.

The contours of the right of helpless and innocent bystander children of tender years, such as the Petta children, to be free from potentially lethal assault, such as being fired upon with a .357 magnum, was sufficiently clear on January 15, 1990 that a reasonable official in Rivera's alleged position would have understood that what he was doing violated the Petta children's constitutional rights. Even in the absence of any analogous judicial precedent, a reasonable officer would or should have known that such egregious conduct was unlawfully excessive and unconstitutional.

b.

The fact that *Coon v. Ledbetter*, 780 F.2d 1158 (5th Cir.1986) and *Jefferson v. Ysleta*, 817 F.2d 303 (5th Cir.1987) had been published prior to Rivera's egregiously excessive assault upon the Petta children only served to confirm that such conduct was constitutionally intolerable. No reasonable person charged with knowledge of these cases would have thought that Rivera's alleged conduct would be sanctioned constitutionally simply because the Petta children suffered severe emotional rather than physical injury.

This court in *Coon v. Ledbetter*, 780 F.2d 1158 (5th Cir.1986) held that four year old Racheal Ledbetter, who sustained serious emotional trauma but apparently no physical injury during a shootout between her father and sheriff's deputies, had made the proof of personal loss required for a § 1983 constitutional claim under the *Shillingford* substantive due process standard. Racheal's injuries arose when sheriff's deputies fired a round of heavy buckshot into a trailer occupied by Racheal and her father, despite the fact that the deputies knew or should have known that other persons besides Racheal's father were in the trailer.

Further, in *Jefferson v. Ysleta Independent School District*, 817 F.2d 303 (5th Cir. 1987) this court held that eight year old Jardine Jefferson, who suffered humiliation, mental anguish, and a learning impairment, but no apparent physical injury, after being tied to a chair by school officials for nearly two school days, stated a valid § 1983 claim for violation of her substantive due process

rights under the *Shillingford* standard. In addition, the *Jefferson* court went on to state that:

The defense of qualified immunity protects a public official from liability in the performance of his duties unless he violates a clearly established statutory or constitutional right of another known or knowable by a reasonable person. *Harlow v. Fitzgerald* . . . .

***

In determining what a reasonable teacher should know in this instance, it is not necessary to point to a precedent on all-fours with the case at bar. It suffices that the teacher be aware of general, well-developed legal principles.

*Jefferson*, 817 F.2d at 305 (footnote omitted); *see Mouille v. City of Live Oak*, 918 F.2d 548, 551 (5th Cir.1990).

Although the cases were not necessary to inform a reasonable officer that such conduct was unconstitutionally wrong, *Coon v. Ledbetter* and *Jefferson v. Ysleta*, clearly indicate that if a state official causes serious emotional or psychological harm, even without physical injury, to a young child by the use of deadly force or other outrageous conduct disproportionate to the need for any action under the circumstances that was maliciously or wantonly applied so as to shock the conscience, the child's claim for violation of her substantive due process right should be redressed under § 1983.

c.

There is nothing in the cases cited by the majority that would have caused a reasonable person to have any reasonable doubt that the behavior attributed to Rivera violated the Petta children's clearly established Fourteenth Amendment substantive due process rights merely because his actions caused severe psychological harm as opposed to severe physical injury. In particular, there is nothing in *Dunn v. Denk*, 79 F.3d 401 (5th Cir. 1996) (*en banc*) or *Johnson v. Morel*, 876 F.2d 477 (5th Cir.1989) (*en banc*), that would cause a reasonable official to believe that Rivera's alleged violent firearm assaults upon

the Petta children were not constitutionally prohibited.

In *Johnson v. Morel*, this court reversed a summary judgment for an officer and remanded the case for trial on the plaintiff's § 1983 claims under the *Fourth Amendment* and the *Equal Protection Clause.* Specifically, this court recognized that *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), decided earlier that year, "teaches each constitutional claim identified must be judged by reference to its own specific constitutional standard." *Id.* at 479. Because Johnson alleged that Morel intentionally discriminated against him and used excessive force while arresting him (claims found to fall under the Fourth Amendment and Equal Protection clause) this court expressly recognized that *Graham* would not permit Johnson's claims to be analyzed or sustained under the substantive due process clause. *Id.* at 480. *Johnson v. Morel*, therefore, does not contain anything that would cause a reasonable person to believe that the law had changed with regard to alleged excessive use of force by an officer upon an innocent bystander as was the case in *Shillingford v. Holmes*, 634 F.2d 263 (1981), and especially not with regard to an officer's egregious behavior in intentionally or wantonly discharging deadly firearms upon helpless and innocent bystander children of tender years for no reasonable purpose as in the present case or as was confirmed in *Coon v. Ledbetter*, 780 F.2d 1158 (5th Cir.1986).

*Dunn v. Denk*, 79 F.3d 401 (5th Cir.1996) (*en banc*), was simply a retrospective look at what *Johnson v. Morel* contributed to a reasonable person's knowledge of the contours of the Fourth Amendment right of a person to be free of excessive force during an arrest in 1990. Consequently, it contributes nothing more than *Johnson v. Morel* itself with respect to the Fourth Amendment right of an arrestee in 1990. Moreover, *Dunn v. Denk* contributed nothing whatsoever to what a reasonable person would have known in 1990 about the contours of the substantive due process rights of innocent bystander children to be free from a police officer's unreasonable, outrageous and constitutionally intolerable assaultive gunfire.

The majority fails to demonstrate any sound or coherent basis for its assertion that in January 1990, the Petta children as innocent bystanders did not have a "clearly established" substantive due process right to be free from egregiously wanton or malicious excessive and potentially deadly force by Rivera resulting in their severe psychological damage. The majority correctly points out that when this court decided *Johnson v. Morel*, 876 F.2d 477 (5th Cir.1989) (*en banc*) it required that an adult plaintiff in a § 1983 action based on excessive police force during an arrest or investigatory stop must prove, in order to recover, not only the violation of his Fourth Amendment right but also that "significant injuries resulted from the officer's use of excessive force." *Id.* at 479. But the majority incorrectly argues that the *Johnson v. Morel* Fourth Amendment interpretation also somehow "affected" the Fourteenth Amendment right of innocent bystanders to be free from a state officer's action that is grossly disproportionate under the circumstances, inspired by malice or wantonness, and that amounts to an abuse of official power that shocks the conscience. This contention is simply wrong because the *Johnson v. Morel* court specifically stated that its holding had no effect upon *Fourteenth Amendment* substantive due process rights because of the constraints of *Graham v. Connor*. *Id.* at 479–480. Besides sharing the same Fourth amendment features as *Johnson v. Morel*, all of the other cases relied on by the majority were decided subsequent to Rivera's firearm and other assaults upon the Petta children and therefore could have had no effect upon the Petta children's clearly established substantive due process rights at the time of their violation by Rivera.

The majority also asserts without coherent demonstration that there is no principled reason for drawing an analytical distinction between the Petta children's substantive due process claim and an adult arrestee's Fourth Amendment claim. The distinction between the contours of the two kinds of constitutional rights, however, were clear and evident. The helpless and innocent bystander children's substantive due process right to be free of a police officer's egregious behavior

involving excessive and unwarranted deadly force is clear and distinct from that of an adult suspect or offender who has run afoul of the law to be free from excessive force during an arrest or investigatory stop.

## VII.

The law with regard to the Fourteenth Amendment was clearly established in January of 1990. The *Shillingford v. Holmes* test stated that:

> In determining whether the state officer has crossed the constitutional line that would make the physical abuse actionable under Section 1983, we must inquire into the amount of force used in relationship to the need presented, the extent of the injury inflicted and the motives of the state officer. If the state officer's action caused severe injuries, was grossly disproportionate to the need for action under the circumstances and was inspired by malice rather than merely careless or unwise excess of zeal so that it amounted to an abuse of official power that shocks the conscience, it should be redressed under Section 1983. *Hall v. Tawney,* 621 F.2d at 613; *Johnson v. Glick,* 481 F.2d at 1033.

634 F.2d at 265. Even without reference to *Coon* or *Jefferson,* I am persuaded that on January 15, 1990 a reasonable law enforcement officer knew or should have known that to attack a family suburban automobile occupied by an unarmed mother and her three and seven year old children by firing on the vehicle with a .357 magnum, bludgeoning its window, pointing the .357 magnum in the direction of the mother and three year old child while threatening to kill the mother, and other acts of excessive force and violence, in connection with minor traffic violations, was constitutionally impermissible. Rivera's misbehavior was simply too egregious to justify concluding that that because of language in cases involving an entirely different context, i.e., the arrest, detention and seizure of adult suspects, offenders or prisoners, a reasonable officer in Rivera's situation would not know or should not know that his actions in assaulting helpless and innocent bystander children with deadly force for no justifiable reason violated the Petta children's Fourteenth Amendment substantive due process constitutional rights and subjected him to liability under § 1983 for their severe psychological damage. Young three and seven year old children have a constitutional right not to be subjected by state officials to the danger and terror of such deadly and violent force, resulting in their severe emotional pain and psychological damage, regardless of the fact that they fortuitously escaped physical injury in a torturous ordeal that easily could have resulted in their death or serious bodily harm.

For the foregoing reasons, I would affirm the district court's denial of summary judgment and remand the case to that court for further proceedings. Therefore, I respectfully dissent.